IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

DONNA WOODS, et al.,

        Plaintiffs,

v.                              CIVIL ACTION NO.  2:09-cv-00366

TOWN OF DANVILLE, WEST VIRGINIA, et al.,

        Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending before the court are motions for summary judgment by defendants Officer Arthur Jarrett [Docket 48] and the Town of Danville, West Virginia [Docket 50].  For the reasons stated below, Officer Jarrett's motion is **GRANTED in part** and **DENIED in part**, and the Town of Danville's motion is **DENIED**.

**I.**    **Background**

    *A.*    *Facts*

        *1.*    *The August 10, 2008 Incident*

On August 10, 2008, Officer Arthur Jarrett was employed as a police officer for the Town of Danville, West Virginia ("Danville").  He was not a certified police officer.[1]  He had been employed with the Danville police department for approximately eight days and had never worked as a police officer before taking the job.

---

[1] To become a "certified officer" in West Virginia, an applicant must undergo a sixteen-week, 850-hour intensive course at the West Virginia State Police Academy.

In the early evening of August 10, 2008, a 911 dispatch broadcast a "Signal 12 with weapon" (fight with a weapon in progress) in the town of Madison, West Virginia ("Madison"). Madison and Danville neighbor one another. After a Madison police unit responded to the call, 911 issued a second dispatch for "any unit available" to back up the Madison unit. (Jarrett Dep. 69:11). Although he was a Danville, rather than a Madison, police officer, Jarrett responded to the second call. He was not individually dispatched, nor did he attempt to contact his Chief of Police before responding. On his way from Danville to Madison, Jarrett heard a radio bulletin describing the alleged suspect as a "[m]ale running down Main Street towards the car wash in a white tee shirt." (*Id.* at 75:9-10). A unit from the Madison Police Department asked over the radio "if that was the one with the gun," and 911 responded that they were "unsure." (*Id.* at 75:12-13). Jarrett arrived in Madison and pulled his unmarked police car to the side of the road near the car wash, where he could observe anyone who might be running toward it.

Shortly thereafter, Jarrett observed a person running down Main Street toward the car wash in a white tee shirt. This person was Andrew Lee Adkins, a fourteen-year-old member of the Scott High School cross country team who was out for a run. Adkins was approximately five feet two inches tall and was of slender build. In addition to the white tee shirt, he wore black running shorts, a sport watch, and running shoes.

Seeing Adkins, Jarrett emerged from the patrol car with his firearm drawn and yelled to Adkins, "Get the fuck on the ground." (Adkins Dep. 20:16-17). Adkins put his hands up and asked Jarrett what he did wrong. Jarrett again ordered Adkins to get on the ground. Adkins complied while continuing to ask Jarrett what he did wrong and telling him he had the wrong person. Jarrett handcuffed Adkins and told him to get up. The tightness of the handcuffs caused Adkins pain.

Jarrett then pulled Adkins off the ground by the handcuff chain, which Adkins claims caused additional pain, cuts, and bruising to his wrists.

Jarrett placed Adkins in the police car for a short time, after which he heard a radio transmission that caused him to realize that he had the wrong suspect. He released Adkins and said, "Sorry for the scare. You may go." (Adkins Dep. 35:21-22). Adkins ran back to his grandparents' house, which is located in Madison.

### 2. *Training of Officers*

Danville's Chief of Police Phillip Boehm is responsible for training new officers in the Danville Police Department. He typically instructs trainees to read the Danville Police Department's Regulations, Policy and Operating Procedures Manual (the "Manual"), answers trainees' questions, asks trainees to prepare mock police reports for common crimes, and takes them on patrol. Chief Boehm stated that he teaches proper arrest procedure during training, but only if he actually arrests someone. Generally, after a week or so of training, depending on a new officer's progress, Chief Boehm will allow the new officer to go on patrol alone, regardless of whether he has been certified to use a firearm.

As part of his training, Jarrett reviewed the Manual, asked Chief Boehm questions, prepared mock police reports, and rode along with Chief Boehm. He did not recall any specific instructions from Chief Boehm about how to properly apprehend a suspect. And as of August 10, 2008, Jarrett was not qualified to carry a firearm.[2]

---

[2]Chief Boehm testified that the state requires officers to "get certified on their weapons" two times a year. Although the record does not reveal precisely what the certification process entails, Jarrett was not qualified to use a weapon as an officer until August 18, 2009, eight days after the incident giving rise to this action. (*See* Boehm Dep. 37:13-17). In fact, the city does not provide
(continued...)

### *3. Facts Regarding the Hiring and Retention of Officers*

As part of his duties, Chief Boehm typically interviews every applicant for open officer positions. He testified that he conducts a criminal background check of all potential officers and contacts the references listed on their applications. Danville does not, however, conduct a psychological fitness-for-duty evaluation for officer applicants, nor has it considered making such evaluations part of the officer hiring process.

Jarrett's employment history includes military service in the Navy, followed by spotty employment with various companies. Two years after enlisting in the Navy in 1991, Jarrett was discharged "under other than honorable conditions" because of unlawful drug use. (Ex. E, Pls.' Resp. Opp'n Mot. for Summ. J. Danville). Between the time of his Navy discharge and his job with Danville, Jarrett held more than ten jobs. Jarrett was fired from his job at Wal-Mart for taking a customer's car out and spinning its tires on the concrete. He quit his job at Independence Coal Company because he was "pissed [] off" for getting written up. (Jarrett Dep. 23:4-9). He was terminated from his job driving for Cuyahoga Ambulance of Cleveland, Ohio, because he had points on his license and Cuyahoga's insurance company would not cover him.

There is no evidence that Chief Boehm knew about or even looked into Jarrett's termination from Wal-Mart or Cuyahoga Ambulance, or the disciplinary action taken at Independence Coal. At the time of Jarrett's hiring, Chief Boehm was unaware that Jarrett had been other than honorably discharged from the Navy for drug use.

---

²(...continued)
the new officers with weapons; they use their own. Chief Boehm simply asks that their weapons "stay within the forty cailber range." (*Id*. at 38:3-4).

Chief Boehm did contact a few of Jarrett's listed references, including a deputy sheriff who had "known [Jarrett] for several years." (Ex. D, Pls.' Resp. Opp'n Mot. Summ. J. Def. Danville). The deputy first told Chief Boehm that "this would be a good job for [Jarrett]," but later called back and explained to Chief Boehm that Jarrett "has problems with anger." (*Id*.) Chief Boehm later indicated that he recalled "that [Jarrett] had a problem with anger," but could not remember whether he found out before or after he had hired him. (Boehm Dep. 70:11-14).

### B. *Procedural History*

On March 24, 2009, Adkins's parents, Donna and Harold Woods, filed suit on Adkins's behalf in the Circuit Court of Boone County, West Virginia. The Complaint alleges four counts. The first two counts assert claims against Jarrett for Fourth Amendment violations under 42 U.S.C. § 1983. Count One alleges that Jarrett falsely arrested Adkins, and Count Two claims that Jarrett used excessive force against Adkins. Count Three asserts a federal claim for municipal liability against Danville. Count Four asserts several state law claims against Jarrett and Danville.

The defendants removed the case to federal court on April 14, 2009, on the basis of federal question jurisdiction. On February 9, 2010, Jarrett and Danville filed separate summary judgment motions. The plaintiffs responded on February 23, 2010, and the defendants replied on March 4, 2010. The matter is ripe for review.

## II. Standard of Review

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Instead, the court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

### III.  Discussion

#### A.  Claims against Officer Jarrett

##### 1.  Federal Claims

Title 42 U.S.C. § 1983 subjects to civil liability any person who, acting under color of state law, deprives an individual of his constitutional or federal rights. The plaintiffs allege that Jarrett violated Adkins's Fourth and Fourteenth Amendment rights by seizing him without reasonable suspicion and employing excessive force in doing so. Jarrett asserts that qualified immunity precludes the claims against him.

###### a.  Qualified Immunity

Qualified immunity is meant to "strike[] a balance between compensating those who have been injured by official conduct and protecting the government's ability to perform its traditional functions." *Wyatt v. Cole*, 504 U.S. 158, 167 (1992). Government officials, such as police officers, should benefit from immunity where "it [i]s necessary to preserve their ability to serve the public good." *Id*. Where a police officer acts outside the scope of his authority, however, the rationale behind the qualified immunity defense falls away. Indeed, the Fourth Circuit has held that "when a government official [] act[s] totally beyond the scope of his authority, he received no immunity at common law and is entitled to none under § 1983." *In re Allen*, 106 F.3d 582, 594 (4th Cir. 1997); *see also Barr v. Matteo*, 360 U.S. 564, 572 (1959) (observing that "'decisions have, indeed, always imposed as a limitation upon the immunity that the official's act must have been within the

scope of his powers . . .'" (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949)). *Cf. Lenz v. Winburn*, 51 F.3d 1540, 1547 (11th Cir. 1995) (concluding that guardian ad litem not entitled to qualified immunity because she "acted outside the scope of her authority"). In such cases, the defendant "bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'" *Henry v. Purnell*, 501 F.3d 374, 377 n.2 (4th Cir. 2007) (quoting *Allen*, 106 F.3d at 593, 594 (internal punctuation omitted)).

In order to determine whether Jarrett is entitled to assert a qualified immunity defense, I must first determine whether he was acting within the scope of his authority as a Danville police officer. To assess this authority, I will look to West Virginia law, the Manual, and specific directions by Chief Boehm.

> West Virginia law provides that
>
> In order to arrest for the violation of municipal ordinances and as to all matters arising within the corporate limits and coming within the scope of his official duties, the powers of any . . . policeman . . . shall extend anywhere within the county or counties in which the municipality is located, and any such . . . policeman . . . shall have the same authority of pursuit and arrest beyond his normal jurisdiction as has a sheriff.

W. Va. Code § 8-14-3. The West Virginia Supreme Court of Appeals interpreted this statute to mean that a police officer does not have official authority to arrest a person unless the arrest is made "in connection with a matter that arose within the territorial boundaries of [the officer's] jurisdiction," or otherwise "come[s] within the scope of his official duties." *State ex rel. State v. Gustke*, 516 S.E.2d 283, 289 (W. Va. 1999).

Applying *Gustke* to this case, first, it is undisputed that the 911 call arose from conduct occurring within the territorial boundaries of Madison, not Danville. Second, to determine whether driving to Madison in response to the dispatch was "within the scope of [Jarrett's] official duties,"

the court must look to the direction that he received both in the Manual and from Chief Boehm.[3] The Manual only permits pursuit beyond the "boundaries of Danville" if the officer is pursuing a fleeing suspect, and even then, only if stopping the pursuit "would result in [] death or critical bodily harm to other law enforcement officers, or the public at large." (Ex. D, Pls.' Resp. Mot. Summ. J. Def. Jarrett, at 72.) When Jarrett left Danville, he was not chasing a fleeing suspect, but rather, he was responding to a backup call that was not directed to him.

In addition, the Manual provides that all police officers "shall perform their duties as required or directed by law, departmental rule, policy, or *order of a superior officer*." (Ex. D, Pls.' Resp. Mot. Summ. J. Def. Jarrett, at 10 (emphasis added)). Chief Boehm testified numerous times that neither Jarrett, nor any new officer, was to go outside of the city limits. *See, e.g.*, Boehm Dep. 29:17-21 ("I ask all officers to stay within the town's jurisdiction. I've been in situations where the backup comes from other departments. We ask, though, that all uncertified officers – well, we ask for all new officers to stay within the town's boundaries."); *id*. at 35:6-8 ("We ask that all officers stay within the jurisdictional city limits. This also includes me, sir."); *id.* at 36:18-25 ("We verbally tell [the officers] that they need to maintain their jurisdictional city limits as much as possible. . . . I tell them that I would prefer that they would stay within the city limits."); *id*. at 50:3-5, 51:21-24 (stating that Jarrett's act of leaving the city limits was a violation of "my directive" and "my protocol"); *id*. at 62:1-3 ("It was wrong for Arthur Jarrett, under the circumstances, to leave the town without my knowledge first.").

---

[3]Of course, direction from a chief of police or department manual cannot expand an officer's duties beyond the scope of the law. In this case, however, such direction actually restricted the scope of Jarrett's duties.

In fact, Jarrett was issued a written disciplinary warning for "Going out of Town, while on Duty, to Answer backup call to Madison Police Dept. Not being Dispatched or Requested at this time. . . ." (Ex. I, Pls.' Resp. Mot. Summ. J. Def. Jarrett). The written reprimand, signed by Chief Boehm and witnessed by the Mayor of Danville, went so far as to state, "If another such incident occurs again – possible termination of employment can occur." (*Id.*)

Taking this law and procedure into consideration, the court concludes that when Jarrett drove outside of the Danville city limits, he was performing an act beyond the scope of his authority, and as such, he is not entitled to assert the qualified immunity defense.

### b. *Underlying claims*

The court concludes that issues of fact remain on the plaintiffs' § 1983 action. Jarrett's summary judgment motion on these claims, therefore, is **DENIED**.

### 2. *State law claims*

The plaintiffs assert state law claims against Jarrett for assault, battery, false arrest, and outrage. Jarrett contends that state immunity precludes these claims. West Virginia law, rather than federal law, controls this inquiry.

### a. *Immunity*

In West Virginia, a government official is immune from state liability unless any of the following apply:

(1) His . . . acts or omissions were manifestly outside the scope of employment or official responsibilities;

(2) His . . . acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or

(3) Liability is expressly imposed upon the employee by a provision of this code.

-9-

W. Va. Code § 29-12A-5(b)(1)-(3) (2009). For the reasons previously set forth, Jarrett's conduct was "manifestly outside the scope of employment or official responsibilities." His request for immunity on the state law claims is therefore **DENIED**.

> b. *Underlying claims*

Jarrett also argues that the plaintiffs have provided insufficient evidence to survive summary judgment on the underlying state law claims. The court agrees with Jarrett on the outrage claim, but disagrees on the other three claims.

First, the tort of outrage requires that

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

*Harless v. First Nat'l Bank of Fairmont*, 289 S.E.2d 692, 704 (W. Va. 1982) (internal quotation marks omitted). A court must consider whether a defendant's actions might reasonably be interpreted as outrageous. The West Virginia Supreme Court of Appeals explained,

> In evaluating a defendant's conduct in an intentional or reckless infliction of emotional distress claim, the role of the trial court is to first determine whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to constitute the intentional or reckless infliction of emotional distress. Whether conduct may reasonably be considered outrageous is a legal question, and whether conduct is in fact outrageous is a question for jury determination.

*Hatfield v. Health Mgmt. Assocs. of W. Va.*, 672 S.E.2d 395, 404 (W. Va. 2008) (citing *Travis v. Alcon Labs., Inc.*, 504 S.E.2d 419 (W. Va. 1998)). The tort does not require a finding of physical

injury. *Hines v. Hill's Dep't Stores, Inc.*, 454 S.E.2d 385, 389 (W. Va. 1994). It is, however, "a difficult fact pattern to prove." *Id.* at 390. Indeed, "conduct that is merely annoying, harmful of one's rights or expectations, uncivil, mean-spirited, or negligent does not constitute outrageous conduct." *Courtney v. Courtney*, 413 S.E.2d 418, 423 (W. Va. 1991). The court concludes that Jarrett's conduct cannot reasonably be regarded as so extreme and outrageous to constitute the tort of outrage under West Virginia law. Therefore, Jarrett's motion is **GRANTED** as to the outrage claim.

Next, because issues of fact exist on the § 1983 false arrest and excessive force claims, there are likewise issues of fact as to whether Jarrett is liable for assault and battery under West Virginia law. *See California v. Hodari D.*, 499 U.S. 621, 631 n.6 (1991) ("One who undertakes to make an arrest without lawful authority, or who attempts to do so in an unlawful manner, is guilty of an assault if the other is ordered to submit to the asserted authority, is guilty of battery if he lays hands on the other for this unlawful purpose." (quoting Rollin M. Perkins, *The Law of Arrest*, 25 Iowa L. Rev. 201, 263 (1940))). Therefore, Jarrett's motion on these claims is **DENIED**.

Finally, the tort of false arrest/imprisonment, also known as unlawful detention, requires "the detention of a person" and "the unlawfulness of the detention and restraint." *Riffe v. Armstrong*, 477 S.E.2d 535, 552 (W. Va. 1996) (overruled on other grounds, *Moats v. Preston Co. Comm'n*, 521 S.E.2d 180, 187 (W. Va. 1999)). Because issues of fact exist as to the lawfulness of Jarrett's actions, Jarrett's motion on this claim is **DENIED**.

    **B.**    **Claims against Danville**

Counts Three and Four of the Complaint assert a federal claim against Danville for municipal liability, and state law claims for negligent hiring, retention, and supervision.

### 1. Federal Municipal Liability

The plaintiffs bring suit against Danville for municipal liability under 42 U.S.C. § 1983, arguing that Adkins's Fourth Amendment rights were violated as a result of Danville's policy and custom of inadequate training and supervision of its officers. Municipalities may be sued under § 1983 for unconstitutional policies. *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978). To succeed on such a claim, plaintiffs must "adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999). A municipal custom may arise if "a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a custom or usage with the force of law.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691).

The plaintiffs allege that Adkins's constitutional rights were violated "based upon [Danville's] long-standing custom of routinely placing into service police officers who were unqualified[,] under-trained, and unsupervised." (Pls.' Resp. Opp'n Mot. Summ. J. Def. Danville 1). The Supreme Court has held that demonstrating a policy of inadequate training requires proof of "deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). The *Harris* Court explained,

> [I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for

>which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnotes omitted). In fact, the Court foreshadowed a situation such as the one in this case, where police officers are permitted to carry firearms without proper training:

>[C]ity policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons. The city has armed its officers with firearms, in part to allow them to accomplish this task. Thus, the need to train officers in the constitutional limitations on the use of deadly force can be said to be "so obvious," that failure to do so could properly be characterized as "deliberate indifference" to constitutional rights.

*Id.* at 390 n.10 (internal citation omitted). It is undisputed that officers were not required to be certified to carry a firearm before they became a Danville police officer. Furthermore, Danville did not train its officers how to properly and lawfully apprehend a suspect, but rather "turn[ed] [officers] loose," (Dep. Boehm 34:7), essentially unsupervised, after only a week of riding with Chief Boehm and filling out mock reports. These customs show deliberate indifference on the part of Danville. Indeed, the fact that new officers must ask Chief Boehm for permission before arresting anyone supports the conclusion that the officers were too untrained and inexperienced to carry out their responsibilities.

But the court must go one step further and conduct a causation inquiry. In order for liability to attach to the municipality, "the identified deficiency . . . must be closely related to the ultimate injury." *Harris*, 489 U.S. at 391. In other words, "[w]ould the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?" *Id.* Jarrett clearly disobeyed Chief Boehm's direction to stay within Danville's jurisdiction unless he asked permission to go elsewhere. There are, however, issues of fact as to whether Danville properly

trained and supervised Jarrett, such that his actions could have been avoided. For these reasons, Danville's request for municipal immunity is **DENIED** and the municipal liability claim survives.[4]

### 2. *State Law Claims*

#### a. *Immunity*

The court will first determine whether Danville is entitled to statutory immunity on the state law claims. The West Virginia Governmental Tort Claims and Insurance Reform Act provides that a municipality is immune from liability resulting from "the failure to provide, or the method of providing police, law enforcement or fire protection." W. Va. Code § 29-12A-5(a)(5). The statute "refers to the decision-making or the planning process in developing a governmental policy, including how that policy is to be performed." *Smith v. Burdette*, 566 S.E.2d 614, 618 (W. Va. 2002).

Danville asserts that it is entitled to municipal immunity because "[t]he claims advanced by plaintiffs against the Town of Danville . . . are policy matters and/or administrative decisions" under the statute. (Mem. Supp. Mot. Summ. J. Def. Danville 17). The plaintiffs counter that "[t]he logic and rational [sic] afforded by this immunity is not implicated by the instant case. Rather than

---

[4]The court is satisfied that the federal causes of action can proceed against both Jarrett and Danville, even though Jarrett disobeyed Chief Boehm's orders to stay within Danville's municipal limits. Although a respondeat superior cause of action against Danville would not suffice under these facts, "municipal liability cannot rest on the doctrine of respondeat superior." *Zepp v. Rehrmann*, 79 F.3d 381, 385 (4th Cir. 1996); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986) (observing that the "official policy" requirement of *Monell* was "intended to distinguish acts of the municipality from acts of employees of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible"). The plaintiffs, rather than asserting a respondeat superior claim, contend that because of Danville's policies and customs, Jarrett was not properly supervised or trained. The federal claim against Danville, therefore, is not foreclosed by Jarrett's actions.

claiming that Danville provides insufficient police protection, Plaintiffs are claiming that Danville was negligent in hiring, training, and supervising Officer Jarrett." (Pls.' Resp. Opp'n Mot. Summ. J. Def. Danville 12). The court agrees with the plaintiffs.

Section 29-12A-5(a)(5) is not "so broad as to immunize a city on every aspect of negligent police and fire department operations." *Smith*, 566 S.E.2d at 617. *Smith* explained that the statute provides immunity to law enforcement entities when claims against them are aimed at

> basic matters [such] as the type and number of fire trucks and police cars considered necessary for the operation of the respective departments; how many personnel might be required; how many and where police patrol cars are to operate; the placement and supply of fire hydrants; and the selection of equipment options.

*Id* (quoting *Mallamo v. Town of Rivesville*, 477 S.E.2d 525, 535 (W. Va. 1996)). The statute simply does not contemplate immunity where a plaintiff sues based on negligent hiring and supervision of an employee. For this reason, Danville is not immune from the plaintiffs' state law claims.

### b. *Negligent Hiring and Retention*

The plaintiffs allege that the negligent hiring and retention of Jarrett resulted in physical and emotional injury to Adkins. They maintain that

> sufficient evidence exists which would permit a reasonable jury to conclude that Danville was negligent in hiring in [sic] inexperienced, untrained law enforcement officer who had a known propensity toward anger and a lack of respect for authority, all of which were known, or should have been known, to Chief Boehm when Officer Jarrett was hired.

(Pls.' Resp. Mot. Summ. J. Def. Town of Danville 14.) Danville cursorily denies these allegations, arguing – without citing any authority – that "one cannot reverse-engineer the

decision based on 20-20 hindsight and/or materials and information which were unable [sic] to the employer at the time of hiring." (Mem. Supp. Mot. Summ. J. Def. Danville 17).

The parties agree that West Virginia has recognized a cause of action based upon negligent hiring and retention. *See State ex rel. West Virginia State Police v. Taylor*, 499 S.E.2d 283, 289 n.7 (W. Va. 1997); *McCormick v. W. Va. Dep't of Public Safety*, 503 S.E.2d 502, 506-07 (W. Va. 1998) (per curiam). The test for determining whether an employer negligently hired and retained an employee is as follows:

> When the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?

*McCormick*, 503 S.E.2d at 506. The court must also consider "the nature of the employee's job assignment, duties and responsibilities." *McCormick v. W. Va. Dep't of Public Safety*, 503 S.E.2d 502, 507 (W. Va. 1998) (per curiam). The duty with respect to hiring and retention increases "as the risks to third persons associated with a particular job increase." *Id.* at 507.

The plaintiffs present issues of fact regarding whether Danville reasonably investigated Jarrett's background when making its hiring decision. The employer's duty is heightened in this case due to the nature of police work. Police officers are, among other things, permitted to carry guns, use necessary force to effect arrest, and enter civilian residences in certain circumstances. In light of this heightened duty, a reasonable jury could find that Danville did not adequately investigate Jarrett's military service, conduct a psychological fitness for duty evaluation, or adequately follow up on Jarrett's references. Given the information about Jarrett's propensity

-16-

toward anger, his spotty employment history, and the facts surrounding his other-than-honorable discharge from the Navy, the plaintiffs have sufficiently alleged genuine issues of material fact on their claims of negligent hiring and retention. Danville's motion on these claims is therefore **DENIED**.

### c. *Negligent Supervision*

Under West Virginia law, negligent supervision claims must rest upon a showing that Danville failed to properly supervise Jarrett and, as a result, Jarrett proximately caused injury to the plaintiffs. *Taylor v. Cabell Huntington Hosp. Inc.*, 538 S.E.2d 719, 725 (W. Va. 2000) (treating negligent supervision like other claims based in negligence). Viewing the facts in the light most favorable to the plaintiffs, and in light of the customs and policies of Danville, explained above, the court concludes that the plaintiffs have presented a genuine issue of material fact as to whether Danville properly supervised an officer who had minimal training and who had only been on the job for eight days, and whether that lack of supervision proximately caused Adkins's injuries. Danville's motion on this claim is therefore **DENIED**.

**IV.    Conclusion**

Jarrett's Motion for Summary Judgment [Docket 48] is **GRANTED in part** and **DENIED in part**. The following claims survive against Jarrett: false arrest and excessive force claims under § 1983; and assault, battery, and false arrest/imprisonment claims under state law. Danville's Motion for Summary Judgment [Docket 50] is **DENIED**. The following claims survive against Danville: municipal liability under federal law; and negligent hiring, retention, and supervision under state law.

The court **DIRECTS** the Clerk to send a copy of this written opinion and order to counsel of record and any unrepresented party. The court further **DIRECTS** the Clerk to post a copy of this published opinion on the court's website, www.wvsd.uscourts.gov.

ENTER: May 14, 2010

_____
Joseph R. Goodwin, Chief Judge